## CONCERNING SALE OF SCHOOL PROPERTY IN A DISTRICT WHICH HAS BEEN CENTRALIZED.

Common Pleas Court of Seneca County.

ELMER FEASEL v. THE BOARD OF EDUCATION.

Decided, November 29, 1922.

*Schools—Required Procedure before Sale of Disused Properties—In a District where Centralization has been Effected—Injunction to Prevent such Sale not Available, When—Construction of Sections 7730 and 7730-1.*

Centalization does not of its own force suspend a school, and where none of the schools of the centralized district have been suspended in the manner provided by Section 7730 and the four year period provided by statute has not elapsed, an action does not lie to prevent the sale of the properties in disuse.

PLATT, J.

Jackson township, Seneca county, Ohio, school district, by a vote of the people had in due form, adopted centralization of its schools on the 19th day of February, 1920, and the board of education proceeded thereafter to centralize the district schools.

None of the schools of the district in operation before centralization have been suspended by force of any action taken under the provisions of Section 7730, General Code, or abandoned temporarily or otherwise, unless centralization *ex propria vigore* worked such suspension or abandonment.    That board of education is now threatening to sell all of the school properties in the district, except that in which the centralized schools of the district are conducted, before the period of four years after such centralization, and the plaintiff, setting up in his petition the appropriate averments therefor, seeks to enjoin such sale.    The petition is demurred to on the ground that the averments made in the petition do not constitute a cause of action against the defendant in favor of the plaintiff.

The plaintiff claims that he is entitled to an injunction on the ground that the proposed sale is prohibited by Section 7730-1

of the General Code, while the defendant contends that the latter section does not apply to a case in which the schools of a school district are in temporary disuse because of centralization. In other words, the plaintiff contends that inasmuch as the general scope and purpose of Section 7730-1 of the General Code are to prevent a sale of school buildings and grounds prematurely, before it becomes reasonably certain that they will be no longer needed in the plan of education of such district, the provisions of Section 7730-1 shall be enlarged by construction so as to prevent school property from being sold until four years after centralization.

The doctrine of judicial construction of statutes is involved and is of the very essence of the case.

The case can not be correctly studied without reference to Section 4756, General Code, under which plenary power is conferred on boards of education of rural school districts to sell school property, real or personal, subject only to the terms of that act as to the method to be pursued. There is no question raised in the petition as to the *procedure* of the Jackson township board of education. The attack of the plaintiff is upon the power of the board to sell under any circumstances until four years have elapsed since centralization.

Section 7730-1, General Code, is the only statute that exists in Ohio that attempts to restrict the power conferred on boards of education in Section 4756, General Code. The problem to be solved is this: Shall Section 7730-1, General Code, be so construed as to limit the restriction upon the power of the board of education to cases in which schools have been suspended by the direct action of the board of education, clothed in the form of a resolution providing for such suspension, or shall Section 7730-1 be enlarged by construction so that its legal interpretation shall be as though it reads as follows:

"In order to protect the rights of the petitioners mentioned in Section 7730, where a school has been suspended though either or any of the processes mentioned in such section, and in order to protect the rights of those who may petition for the de*centralization of the schools of a district in which the schools have*

*been centralized,* the school buildings and real estate located in the territory of such suspended school and in which the board of education has legal title, *and the school buildings and real estate in the territory of a centralized school district and in which the board of education has legal title* shall not be sold by the board of education of the district until after four years from such date of suspension in case of a suspended school, and shall not be sold *until after four years from the date of the vote upon centralization in case the schools of the district have been centralized,* unless the school building has been condemned for school use by the chief deputy of the division of work-shops, factories and public buildings.'' The interpolated words are italicized.

Can construction properly go so far?

We are urged to do so on the plausible ground that it is just as necessary for a board of education to be prevented from selling the school property located in a centralized district within four years from the vote on centralization, as it is that it should be prevented from selling the school property located within a suspended district for four years from the date of the suspension.

That it is just as nesessary in the one case as in the other is quite plain. When we consider that, under the limitations of Section 4727 of the General Code, a vote on decentralization may be had in the school district within three years from the date of the vote on centralization and that, should decentralization carry, the schoolhouses in which the children of the district attended school before centralization ought to be in existence and in the control of the board, so as to enable the schools to be conducted as they were conducted in the status existing before centralization, the argument gathers additional force.

The board of education should not be permitted to sell the school property and use as an argument against decentralization the fact that there are no school buildings in the district, except that or those provided after centralization, to receive the school children. That argument is more of the nature of a club than an appeal to reason.

Notwithstanding the winning power of the argument, the supreme duty of a court in construing a statute is to ascertain, declare and give force to the legislative intent. In doing so,

the terms of the statute itself are of paramount importance. Lewis' Sutherland on Statutory Construction, second edition, Section 348, says:

\* \* \* "The statute itself furnishes the best means of its own exposition, and if the intent of the act can be clearly ascertained from a reading of its provisions, and all its parts may be brought into harmony therewith, that intent will prevail without resorting to other aids for construction." \* \* \*

In harmony with this doctrine is the case reported in the 66th O. S., page 621, *Slinghuff et al* v. *Weaver et al.* In the second syllabus the Supreme Court says:

"But the intent of the lawmakers is to be sought first of all in the language employed, and, if the words be free from ambiguity, and doubt and express plainly, clearly and distinctly the sense of the law-making body, there is no occasion to resort to other means of interpretation. The question is not what did the General Assembly *intend* to enact, but what is the meaning of that which it *did* enact. That body should be held to have meant what it has plainly expressed and hence no room is left for construction.

That case is followed in 82 O. S., 376, the *State* v. *Roney;* in 83 O. S., 146, *Scheu* v. *State of Ohio;* 86 O. S., 80, *Sipe, Auditor,* v. *State ex rel;* 88 O. S. 71, *State ex rel City of Toledo,* v. *Lynch, Auditor;* 91 O. S., 354, *Village of Elmwood Place* v. *Schanzle, a taxpayer;* 92 O. S., 434, *State ex rel Munding, Adm.* v. *Industrial Commission of Ohio;* 96 O. S., 27, *Christ Diehl Brewing Co. et al* v. *Schultz, Treasurer;* 98 O. S., 358, *The Cleveland Telephone Company* v. *City of Cleveland,* and 102 O. S., 591, *State ex rel Durbin* v. *Smith, Secretary of State.* While the case in the 66th O. S., is not expressly cited, the Supreme Court again refers with approval to the principle in 101 O. S., page 501, *Swetland et al* v. *Miles.*

Judged by this test, so repeatedly and emphatically sanctioned by the Supreme Court of Ohio, we must first of all look at Section 7730-1 and to Section 7730 (for they manifestly must be construed together) and ascertain whether or not those two sections construed together leave anything for construction. Are

they clear and unambiguous? If so, no matter how clear it is that there are reasons as potential for preventing the sale of school property within four years after a vote on centralization as in the case of a suspended school, it is a simple case of failure of legislation and the remedy is with the Legislature, not with the courts.

It should not go unnoticed that Section 7730-1, General Code, itself contains an expression of what was the legislative intent in its enactment. It says that it was enacted "in order to protect the rights of the petitioners mentioned in Section 7730, General Code." It would seem superfluous to search with a torchlight for a path to Rome when the Appian way lies in plain view before us.

Who are the petitioners mentioned in Section 7730?

They are those and those only who by written petition ask the board of education to set aside the suspension of the school closed under the provisions of that section by the board of education. The board of education shall suspend a school, under that section, when directed so to do by the county board of education, the latter acting under the conditions referred to in such section, and it may suspend any or all schools of its own initiative because of disadvantageous location or for any other cause.

Does centralization suspend a school of its own force?

It does not.

In an opinion of the attorney general of Ohio of the year 1916, page 496, he declares:

"Where the qualified electors of a rural school district vote in favor of centralization under provisions of Section 4726, General Code, 104 Ohio Laws, 139, the board of ducation in proceeding to centralize the schools of said district, may, in the ercise of its sound discretion, secure sites at different points in such district and erect suitable buildings thereon for the accommodation· of its pupils."

Again in the case entitled *State ex rel Haines,* v. *Board of Education,* 15 O. C. D., 424, it is said:

"Such board can not legally refuse to centralize the schools because the law makes this duty imperative, but the mode and

manner of performaing it are discretionary and, if the duty is not performed by the old board, such discretion is vested . its successor.''

This view seems quite in accord with reason and I accept it as correct.

So none of the schools of Jackson township school district were suspended by the vote of the people of the district in favor of centralization.

Were they or any of them suspended by any act of the board of education in proceeding to centralize since the vote on centralization, within the meaning of the section?

The petition fails to aver what was done by the board of education since, fails to aver what plan of centralization was adopted, whether one central school has been established for the entire district or more than one building is used. One significant fact, however, is that the petition does not contain the averment that the board of education, by a vote of the board as such, suspended all or any of the schools of the district used as schools before the vote on centralization.

The plaintiff seems to assume that centralization of the schools necessarily involved a suspension of all of the schools used before centralization.

There must be a *suspension* of a school or schools before there can be a petition, and there can be no petitioner to protect unless there is first a petition. There has been no act of the board suspending any of the schools in Jackson township school district, and therefore there is no petitioner to protect.

It may be said with great force on behalf of the plaintiff, that, whenever in the plan of centralization, the disuse of a school building used for school purposes before centralization was contemplated, it was the duty of the board of education to adopt a resolution formally suspending such school in order to fix a definite time for the four year limitation, and that the board of education can not shield itself behind its own failure to act and thereby escape the limitations upon the power to sell contained in 7730-1, General Code.

This is putting the case for the plaintiff in its strongest atti-
tude and is a most persuasive presentation of that side of the
controversy. If this view is to be accepted, then what follows?

The fact that one or more or all of the schools attended by the
pupils of the district before the board of education executed
its plans formulated for carrying out the centralization author-
ized by the people of the school district are in disuse, must then
be regarded as the equivalent of suspending such schools by a
formal vote of the board of education, on the principle that a
court of equity will regard that as done which ought to have been
done. If that fact is to be regarded as equivalent to a formal
suspension, then it will be difficult to escape the conclusion that
a majority of the voters of any suspended school have the right,
under the terms of the law, to present a petition to the board of
education of the district asking for a re-opening of the school,
and, if such petition conforms to the requirements as to the time
of its presentation, and the number of signatures thereto, and
otherwise, the board of education would be compelled to re-open
the school, for the terms of the statute are mandatory. If the fact
of the non-user of the school building after centralization would
be equivalent to a suspension of the school by the board of educa-
tion and must be treated as such, the voters of such suspended
school territory have the right also to treat it as a suspension.
If it is a suspension for one purpose, it is also a suspension for
all purposes. It can not be both a fish and a serpent.

What would be the possibilities, nay, even the probabilities,
in store for centralization, once such a doctrine obtained the
sanction of the courts?

There is no better illustration that could be offered than the
case of the Jackson township school district.

Centralization carried by a majority of *three*. Under such cir-
cumstances, it is not only conceivable but quite probable that
most of the electors residing in the purely rural "sub-districts"
voted by small majorities against centralization, while in a single
"subdistrict" embracing a village which has not been incorpo-
rated in which the inhabitants were influenced by the belief that
a beautiful centralized school building would be erected in their

midst, should centralization carry, a large majority voted for centralization, over-topping the majority against centralization in the purely rural "sub-districts." After centralization had been fully accomplished and long before the expiration of the three years provided for in Section 4727, General Code, which must elapse before a vote on de-centralization could lawfully be had, and before centralization could by any possibility have had a fair trial, if petitions could lawfully be presented to the board of education asking for a re-opening of the suspended schools, and the board, finding the petitions to be in conformity to law, was compelled to re-open them under the mandatory terms of the statute, it is a certain thing that such petitions would be presented as soon as it was legally possible to do so, and the result would be that the schools of the centralized district would be speedily de-centralized and the boards of education of every centralized district would be most seriously embarassed in their endeavors to give the centralized schools a fair trial. I say it is a certainty that such petitions would be presented and I have no doubt whatever that every common pleas judge in the state knows this to be true, not theoretically, but experimentally, for there are no feuds in any Ohio community more bitter than the feuds created by the conflicts over centralization, and every advantage given by the law is unhesitatingly used by one side of the controversy to embarass the other.

In the Jackson township case, from what I know personally of the situation, it would be possible for a large majority of the original "sub-district" schools to be soon re-opened after centralization, a vast majority of the pupils attending the centralized schools to be withdrawn and attend the re-opened schools and centralization become a hopeless wreck.

I have no doubt that similar conditions exist in many localities in every county in the state and this patent fact was known to the legislators when Sections 7730 and 7730-1 were enacted, for they are presumed to be men of intelligence and acquainted with notorious facts connected with the current life of the state.

It seems impossible that the Legislature, with the fostering care of a devoted mother, should provide in Section 4726, Gen-

eral Code for centralization, and then priced to put in the hands of the enemies if centralization weapons for its speedy distruction. I do not believe the Legislature intended consequences so injurious and destructive to that which it potentially created, and it is always pertinent in statutory construction to take the consequences of a suggested construction into account.

For this reason I believe that the Legislature did not intend that in case of the disuse of a school building in consequence of centralization, it was the duty of the board of education to suspend formally by resolution the schools so disused, 'because, as I have pointed out, if it did so, the rights of the voters of suspended schools to petition for the re-establishment of the suspended schools would immediately attach, and there is probably not a community in the entire state in which hostile hands would not very quickly pull down the whole structure of centralization by the use of the method of petition. The Legislature intended to give centralization a fair trial. It enacted Section 4726, General Code, for the purpose of originating centralization and did not intend that any decentralization could be had except by a vote of the people of the same school district that first authorized centralization. For this reason Section 4727, General Code was enacted, and it is intended to be the exclusive method for accomplishing de-centralization.

The word "suspension," used in Section 7730, was intended to be a mere temporary suspension, while the suspension of a school worked by centralization, is regarded as permanent, subject only to the results following a vote in favor of decentralization under Section 4727, General Code.

For these reasons the demurrer is sustained.

I want to suggest in this formal way to counsel for the plaintiff that, if this question is to be fairly tested in the higher courts, the petition ought to be amended and it ought to be set out what the board of education did after the vote on centralization which the plaintiff regards as equivalent to a suspension of the schools of the township. If the petition is so amended, the whole question can be fairly tested on demurrer to the amended petition.